**FILED**

AUG 2 2 2007

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|   |   |   |
|---|---|---|
| KATHIE M. DIKE, | \* | CIV. 06-4118 |
| | \* | |
| Plaintiff, | \* | |
| | \* | |
| -vs- | \* | REPORT and RECOMMENDATION |
| | \* | |
| | \* | |
| MICHAEL J. ASTRUE[1], | \* | |
| Commissioner of Social Security, | \* | |
| | \* | |
| Defendant. | \* | |
| | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Plaintiff seeks judicial review of the Commissioner's final decision denying her a period of disability commencing on April 15, 2000[2], and payment of disability insurance and medical benefits under Title II and Title XVII of the Social Security Act.[3] The Plaintiff has filed a Complaint and

---

[1]Pursuant to 42 U.S.C. 405(g), Michael Astrue has been substituted for JoAnne Barnhart as the named Defendant. Mr. Astrue was sworn in as the Commissioner of the Social Security Administration on February 12, 2007.

[2]As noted in the Commissioner's brief, the Plaintiff filed two prior applications for SSI/DIB benefits, one on August 29, 2000 and one on January 24, 2002. Both claims were denied initially and on reconsideration (AR 36-38, 41-57, 562-70). Plaintiff did not appeal either decision. Thus, Plaintiff's disability status has been conclusively adjudicated through September 21, 2002 (the date of the reconsideration determination on her second claim, which became final when she did not appeal) (AR 38, 51-53, 567-70). See 20 C.F.R. § 404.957(c)(1) (ALJ may decline to consider one or more issues if the doctrine of res judicata applies because the Social Security Administration has made a previous determination or decision about Claimant's rights on the same facts and on the same issue or issues, and this previous determination has become final by either administrative or judicial action).

[3]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference –greatly simplified-- is that a claimant's entitlement to SSD/DIB benefits is dependent upon her "coverage" status (calculated according to his earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and

has requested the Court to enter an order instructing the Commissioner to award benefits. Alternatively, the Plaintiff requests a remand pursuant to 42 U.S.C. § 405(g) sentence four, with instructions to obtain clarification of the findings of Dr. McElroy and Dr. Entwistle. The matter is fully briefed and has been referred to the Magistrate Judge for a Report and Recommendation. For the reasons more fully explained below, it is respectfully recommended to the District Court that the Commissioner's Decision be AFFIRMED and the Plaintiff's Complaint be DISMISSED.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g). Judge Piersol referred this matter to the Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and a Standing Order dated November 29, 2006.

## ADMINISTRATIVE PROCEEDINGS

Plaintiff filed her application for benefits in early March, 2004. AR 80-82, 571-74. In a form entitled "Disability Report–Adult" she filed in connection with her 2002 disability application (AR 124-133) Plaintiff listed the following as illnesses, injuries or conditions that limited her ability to work: "both knees have chondromalacia, the right side being more weak and it makes it harder to walk or stand. Muscel (sic) spasms degenerative disc. Back–bulge disc (L3-L4) (L4-L5) Pinch nerve L-5, spondylosis." In August 2004, Plaintiff filed a form entitled "Disability Report–Appeal" (AR 192-98) in which she explained that her illness, injuries or conditions had worsened since she last filled out a disability report in the following ways: "both hands have shown more deformity from the rheumatoid, both knees are swollen, mostly right knee and more painful walking, I've been able to spend about four hours working on my (illegible)." She also claimed new physical limitations as a result of her conditions since her last disability report. "Holding items in my hands, typing on computer key board, using items in the kitchen that I use for preparing meals, writing & holding a pen." AR 192.

Plaintiff's current claim was denied initially on June, 15, 2004 (AR 39), and on

---

reduced by the claimant's earnings, if any.

In this case, the Plaintiff filed her application for both types of benefits at the same time (Early March, 2004). AR 80-82, 571-74.

reconsideration on September 24, 2004 (AR 51-53, 60-61). She requested a hearing (AR 62) and a hearing was held on January 10, 2006, before Administrative Law Judge (ALJ) the Honorable Robert Maxwell. AR 585-636. On February 16, 2006, the ALJ issued a nine page, single-spaced decision affirming the previous denials. AR 18-26. On April 19, 2006, Attorney Crew sent a letter to the Appeals Council requesting review of the ALJ's decision. AR 14, 583-84. The Appeals Council received Attorney Crew's letter as additional evidence (AR 13) but nonetheless denied review of Plaintiff's claim on July 3, 2006. AR 10. Plaintiff then timely filed her Complaint in the District Court on July 11, 2006.

## FACTUAL BACKGROUND

Kathie Dike was born on January 2, 1961 and was 45 years old at the time of the administrative hearing. AR 591. She completed the eleventh grade and has a GED. Id. She completed one year of college and a couple of vocational courses in marketing and human services. Id. Her past job experience includes factory work, fast food, and stocking and clerking at K-Mart. AR 592-94. As of the date of the hearing, Ms. Dike was working part time at a local motel as a breakfast hostess.

Ms. Dike asserts she became disabled on April 15, 2000. AR 80. However, her failure to appeal previous benefit denials precludes an award of benefits for any period pre-dating September 21, 2002. Her medical condition for that time period, therefore, will be discussed only as necessary to lay the foundation for her current claim.

Ms. Dike's current application is based in part on her assertion that her rheumatoid arthritis has worsened since her last application, and that both hands have become deformed, holding items has become difficult, and her ability to prepare meals and write have decreased. AR 192. She also asserts the condition of her knees has worsened, especially the right knee, which causes her pain when walking. Id.

In February, 2001, Ms. Dike underwent an arthroscopic procedure on her right knee. AR 314. The pre-and post-operative diagnosis was patellofemoral degeneration. Dr. Reynen prescribed follow-up physical therapy. AR 468. On August 9, 2001, Dr. Reynen released her from care, limited her to sedentary work pending a formal FCE, and planned to re-evaluate her after that examination. AR 467. She completed the FCE on August 22, 2001. It was conditionally valid, meaning that it represented the levels of activity Ms. Dike perceived she was capable of performing and that she

3

believes working beyond these perceived levels may cause pain or discomfort.  AR 371.  A conditionally valid FCE is also interpreted by the examiner as one in which the participant has given "submaximal effort."  AR 372.  According to the FCE, Ms. Dike could work between 6 and 7 hours per day, and could sit between 5-6 hours, stand 3-4 hours, and walk 2-3 hours.  AR 371-79.  Dr. Reynen saw her again after the FCE and released her to full time work.  AR 464.  She continued to treat with Dr. Reynen throughout 2001 and 2002, during the time her second disability application was under consideration by the Social Security Administration.  He noted her negative MRI results in December, 2001 (AR 463) and suggested steroid injections which she eventually undertook in early 2002 Id.  In June, 2002, Dr. Reynen released her to P.R.N. care.  AR 462.

Ms. Dike visited her rheumatologist (Dr. Mallek) on August 7, 2002, shortly after her second application for benefits was initially denied.  AR 492-95.  He noted that the first time he saw her in 1997, she had an elevated rheumatoid factor, but no signs of inflammatory joint disease.  AR 495. This remained his opinion in 1998 and 1999.  Id.  During the August, 2002 visit Dr. Mallek again noted a positive rheumatoid factor for many years without any active joint disease.  AR 494.  He also noted "bulging discs, degenerative joint disease . . . narrowing of the spinal canal, and a pinched nerve a L5 . . . chondromalacia bilaterally for which she has had arthroscopic surgery on the right and . . fibromyalgia."  Id.  He also noted she was moderately overweight.  Id.  Dr. Mallek noted Ms. Dike's fibromyalgia symptoms had actually improved since her last visit.  AR 493.  He explained that her  finger joints showed no inflammation and no restricted range of motion, although she did report tenderness.  Dr. Mallek reassured Ms. Dike that he could find no signs of active rheumatoid arthritis.  AR 493.  He recommended she continue working with her physiatrist (Dr. Blow) on strengthening exercises for her knees and back.  Id.

After the initial denial of her second application, but before denial on reconsideration, Dr. Blow summarized his findings regarding Ms. Dike on August 28,2002 (AR 504-05).  He noted her treatment for degenerative disc disease, spondylosis, knee problems (chondromalacia and patellofemoral pain) fibromyalgia and chronic knee and back pain and reported inflammatory arthritis.  Despite all these conditions, Dr. Blow found that Ms. Dike was capable of "at least light duty work, even with her history of fibromyalgia and chronic knee and back pain."  AR 504.  (Dr. Blow originally saw Ms. Dike in February, 2002 on a referral from Dr. Reynen and continued to treat

4

her for physical medicine and rehabilitation issues through August, 2002).

Ms. Dike did not treat with any medical providers between the time her second application was denied on reconsideration (September 24, 2002) (AR 51-53) and the time she filed her third application for benefits in March, 2004 (AR 80-82). On May 6, 2004, Ms. Dike reported to Dr. Michele McElroy for a disability examination. AR 540-543. Dr. McElroy noted Ms. Dike's subjective complaints. She did not have access to any of the records regarding Ms. Dike's treatment for elevated rheumatoid factors, but Ms. Dike reported her rheumatoid factor had been elevated in the past and that Dr. Mallek diagnosed her with rheumatoid arthritis and fibromyalgia. AR 540. Dr. McElroy's physical exam revealed Ms. Dike's right foot dragged slightly. Her spine was non-tender over the cervical and thoracic area, but tender over the L3 and L4 region and the SI joint. Her range of motion was good in the shoulders and knees, although her right knee popped and her left had some loud crepitance with range of motion. The knees were stable and no swelling or effusion was noted. Ms. Dike was tender to palpation on the posterior of the patella. AR 543. There was no pain or swelling in the ankles or shoulders. Dr. McElroy noted no abnormalities, pain or swelling in Ms. Dike's fingers, hands or wrists. Her strength level was 5/5 for the upper extremities, and 5/5 for the lower extremities (4/5 on the left). Sensation was normal. AR 543. Dr. McElroy's assessment was lumbar soft tissue injury and spondylosis, and rheumatoid arthritis. Dr. McElroy limited Ms. Dike's ability to lift and carry objects "secondary to her being in constant pain." AR 543. She limited her lifting to 5-10 pounds at a time. Dr. McElroy limited her standing, walking and sitting to four hours per day with frequent breaks and intermittent rest. Id. Stooping, climbing and kneeling was limited secondary to discomfort and chondromalacia of the knees. No limitations based on hand deficiencies. Traveling limited by her ability to walk. Her prognosis was dependent upon "what Dr. Malick says about her rheumatoid arthritis situation." AR 543.

On June 15, 2004, Dr. Frederick Entwistle, (a non-treating, non-examining physician) completed a physical residual functional capacity assessment. AR 251-258. His primary diagnosis was rheumatoid arthritis and secondary diagnosis was spondylosis at the L5 lumbar with obesity. Other noted impairment was patellofemoral degeneration of the right knee. AR 251. Dr. Entwistle limited Ms. Dike to lifting 20 pounds occasionally, 10 pounds frequently, standing six hours in an eight hour work day, sitting six hours in an eight hour work day, and unlimited push/pull. AR 252. In support of his conclusions, he noted the medical history including the 1999 MRI which showed

disc bulging at the L3-4 and mild dessication at L4-5. He also noted Ms. Dike's treatment for her right knee patellofemoral degeneration, including lateral release and chondroplasty in 2001. Dr. Entwistle also noted Ms. Dike's conditionally valid FCE in 2001, which indicated submaximal effort. Dr. Entwistle agreed with Dr. Blow's August, 2002 assessment, indicating Ms. Dike's physical capabilities were greater than indicated on the 2001 FCE. (See AR 504, 252-53). Dr. Entwistle opined that Ms. Dike's "perception of her pain and self-limitation of her activities seems somewhat disproportionate to the objective findings on review of the records." AR 256. He indicated that the treating/examining physician's statements regarding Ms. Dike's physical capabilities were not much different than his own. AR 257.

After the hearing, the ALJ received records from Dr. Craig Smith from the Orthopedic Institute. AR 544. Ms. Dike visited Dr. Smith in December, 2005, complaining of chronic bilateral knee pain since 2001. She described popping and grinding which was not really alleviated much by the surgery in 2001. Dr. Smith's physical exam revealed crepitation in the patellofemoral joint, miserable malalignment syndrome with obesity, femoral anteversion, genu valgus, and pes plaunus but no effusion of either knee,. He noted no mechanical symptoms on flexion circumduction. AR 544. Lachman and pivot shifts bilaterally were negative with no effusion. AR 544. Dr. Smith's assessment was chronic knee pain, patellofemoral in nature. Dr. Smith did not have any surgical options to offer Ms .Dike. AR 545. He predicted chronic, ongoing knee pain and recommended 800 mg of Ibuprofen 3x per day as needed. Id. He released her to work, but limited her kneeling and squatting. He recommended non-weight bearing exercises, biking, swimming, elliptical, etc. AR 545. He recommended ice at night if her knees were painful. The only limitations he imposed were to limit her kneeling and squatting. He instructed her to return if her symptoms worsened or if she had any effusion or mechanical symptoms, at which time he would consider injections or an MRI. AR 545.

Ms. Dike completed a "personal pain questionnaire" on March 31, 2004. AR 168-170. She indicated she had rheumatoid arthritis in her hands which caused pain, stiffness and disfiguration. AR 168. She also stated she had back problems including bulging discs, a pinched nerve, and a cracked vertebrae. She further described her knee problems as very painful, and described spasms in both legs and a shortness of breath. AR 168. She described the location of her pain as: both hands, lower back, both knees, moving into her legs, back and hips, both legs and feet. She explained that

"any kind of movement" as well as sitting and standing made her pain worse. She also claimed that "doing too many household chores without breaks, having long outside the home activities" made her pain worse and that she had pain all day, every day. AR 168. She asserted the pain had worsened in the past 12 months because her hands and fingers were more disfigured, she had more right hip and shoulder pain and more shortness of breath. Ms. Dike asserted she could only sit for 10 minutes, stand 15-20 minutes, and walk 10 minutes before she needed to rest. She completed a "daily activities questionnaire" also on March 31st. AR 171-74. In that document, she explained that she sleeps approximately six hours per night. AR 171. She can dress and bathe herself. She can prepare meals herself. Her husband assists with the grocery shopping because she does not drive. AR 172. She handles all the household finances and bill paying. AR 172. She handles light household cleaning such as dishes, vacuuming, dusting, and laundry. She does some light yardwork and she feeds and waters her dogs. AR 172. Ms. Dike indicated she was on the home computer most of the day. Id. She also explained that she takes her dogs for 10-15 minute walks most days, and can walk a block or so to the thrift store or to the neighbor's house without assistance. AR 172. Ms. Dike also explained that she is the caretaker for her autistic son. AR 173. She also checks on her neighbor and occasionally dog-sits for her. Id. Ms. Dike asserted that her medical problems caused her to need to take breaks when doing the laundry (she needed to rest after a trip down the stairs) and writing anything by hand was very difficult, caused a lot of pain and a lot of mistakes. On the final page of the questionnaire, she explained that she could not work a job where she had to stand for more than an hour, and that her arthritis in her hands prevented her from performing any work which required her to use her hands a lot. AR 174. She explained "I'm always in pain from my back and knees."

Ms. Dike's husband (Chris) completed a "function report–third party" on April 10, 2004. AR 184-191. He described her daily activities as working on the computer, caring for her autistic son and the family dogs, and checking on the elderly neighbor. AR 185. He explained that her disabling back and knee pain affects her sleep. Id. He explained that she can dress, feed and bathe herself, but has trouble with stairs. He concurred with Ms. Dike's assessment that she is able to do light house and yard work and handle the family finances. AR 186-87. He also explained she is no longer able to ride her bike or swim because of her condition. AR 188. He estimated she could lift

7

25 pounds, stand 30 minutes at a time, walk ½ mile, or sit for one hour before needing a break.

On November 11, 2005, Ms. Dike's supervisor from her current place of employment (Country Inn and Suites) completed a "Job Performance Questionnaire" AR 206-08. She described Ms. Dike's job duties as a breakfast hostess as food preparation, handling and serving and cleaning. AR 206. She described Ms. Dike's appearance, personal hygiene grooming and attendance as "good." She reported that Ms. Dike did not required frequent breaks or rest periods. AR 206. The only negative comment Ms. Dike's supervisor made about her performance was that Ms. Dike had a tendency to talk a bit too much with the guests. AR 206.

The administrative hearing was held on January 10, 2006. Ms. Dike, her husband Chris, Ms. Dike's attorney (Mike Crew) ALJ Maxwell, and a vocational expert (Tom Audet) attended the hearing. Ms. Dike and Mr. Audet testified. Ms. Dike described her education (a GED with some college and vocational training) and work history which included factory work, fast food (cashier and food preparation) and retail (stocking and clerking). AR 592-93. Her retail duties included lifting up to 50 pounds. AR 594. She sustained a work-related injury at K-Mart in 1999, which ultimately led her to leave that employment. AR 596. She gradually began to have swelling and pain in her knees after she injured her back. AR 597. Dr. Reynen explained to her that she had cartilage in her knees, and he did a scope and a lateral release and cleaned out the knee. AR 598.

After Ms. Dike left K-Mart, she tried working a few other jobs before she began her breakfast hostess job at the Country Inn and Suites. AR 598. She worked at the Ramada Inn laundry for three months. Id. She worked four hours a day, three or four days a week. AR 599. The job required a lot of standing in one place and bending to fold all the towels and sheets. Id. Ms. Dike did not believe she could do that job eight hours a day because of the repetitive bending and standing in one spot. AR 599-600. She also tried housekeeping at another motel, but that job only lasted about three days because it caused her too much pain. AR 600.

Ms. Dike explained her job at Country Inn and Suites as follows: she is the continental breakfast hostess. She organizes the continental breakfast in the mornings by putting out the trays with bagels, muffins, toast and juice. She also gets out the batter and supplies for the customers to make their own waffles. AR 601. She is required to lift bags of batter mix and jugs of syrup, which she estimated weigh between five and six pounds. Id. She works four days per week from 5:30 a.m.

8

until 11:00 a.m. (6:30 a.m. until 12:00 noon on the weekends). AR 602. Recently (in October) someone quit, so she has been working one extra day per week since then. AR 602. After the busiest breakfast time has passed, Ms. Dike goes to the lobby and does light cleaning, refills the cookie jars, and helps on the computer at the front desk. AR 603-04. She considers her job at Country Inn and Suites within her physical abilities, and she has never had any difficulties performing her duties. AR 621. She has only missed work once because of her back problems. Id. She insisted, however, that she cannot work full-time at any job, including the Country Inn job, because her hip and back would cause her too much pain. AR 624.

Ms. Dike is able to function when she gets home from working at Country Inn and Suites. AR 604. She checks her e mail, feeds the dogs, does the dishes, and starts the laundry. Id. Then she lays down and takes a nap. AR 609. She estimates she spends three hours per day on the computer. AR 627. Ms. Dike asserts, however, that her knees hurt "all the time" at the level of four on a scale of ten (five when she's working, eight when she's rushing around the house after work) AR 605. She explained that sitting, standing or walking for prolonged periods causes her back and legs to hurt. AR 606. She needs to shift positions frequently. Id. She takes Ibuprofen or Tylenol Arthritis for pain, and sometimes (a couple times a month) she ices her back or knee. She or uses a cooling heat gel like Ben-Gay three or four times a week. AR 607-08. She has used prescription medications (Celebrex, Ultram and Mobic) for pain, but quit those because she does not like them. AR 612. She believes the Celebrex caused her breathing problems (AR 612) and the others caused her to feel sick "icky all day" if she took them along with her vitamins. Id. Ms. Dike believes both blood tests and physical examination have confirmed she has rheumatoid arthritis in her hands. AR 628. She last treated with Dr. Mallek for her arthritis issues in 2002. Id. She believed at that time he told her she had active rheumatoid arthritis in her hands. AR 629. She is currently 5'5" tall and weighs 200 pounds. When questioned by the ALJ, Ms. Dike said her doctors have told her to lose weight, but did not indicate any of them have told her that her weight is contributing to her back and knee problems. AR 630.

At the time of hearing, Ms. Dike was not regularly treating with any physician for any of her medical conditions. AR 625. She saw Dr. Smith for a re-check on her knee issues about a month before the hearing. Id. Dr. Smith told her there were no surgical options for her knees, but

recommended wearing her brace. Id. Ms. Dike told Dr. Smith she would not wear her brace because she did not like it. Id. Other than the visit with Dr. Smith, Ms. Dike had not seen any other physician since the Social Security evaluation in May, 2004. AR 625.

Ms. Dike asserts the pinched nerve in her back bothers her every day. AR 610. It causes her to drag her leg. She concentrates on taking better steps so she does not trip. Id. It has caused her to be unable to walk up stairs because she cannot move her leg. Id. These episodes have occurred at work and have caused her to need to sit down. AR 611. At the time of the hearing (January) Ms. Dike was picking up one extra day per week, resulting in her working five days a week at Country Inn and Suites because somebody quit in October Id. , AR 602. She did not notice that working the extra day caused any worsening of her physical condition, but she didn't believe she'd be able to work five days a week continuously for very long. AR 612. She also explained she could not lift more than a gallon of milk, and that riding in a car caused her to "hurt as soon as I get in, as soon as I sit down." AR 613. She described a bad day as one in which she wakes up and puts her pants on wrong and puts her back out. AR 614. "That's all it takes and then I'll end up having a really bad day, in a little more pain the rest of the day." Id.

Ms. Dike is able to dust, vacuum, do some yard work, and take care of her personal hygiene. She does not drive because she has never had a license. AR 615. Her husband drives her to work. AR 619. She was in special ed classes in school, but obtained her GED and had no problem learning her job-related skills. AR 618-20. Her physical problems do not limit her ability to visit with friends. AR 615-16. She also has a twenty year old autistic son at home who is totally dependent upon her. AR 616-17.

The only witness who testified at the administrative hearing other than Ms. Dike was Tom Audet, the vocational expert. AR 631. The ALJ asked the vocational expert two hypothetical questions. The first hypothetical assumed an individual with Ms. Dike's age, education, experience, and limitations as Ms. Dike described them at the hearing. AR 632. Mr. Audet testified that given those limitations, Ms. Dike was not capable of her past relevant work, and was not capable of any other work on a full time basis because of her reported limited standing tolerance and exertional abilities. AR 632-33. The ALJ's second hypothetical assumed a person with Ms. Dike's age, education and experience, but adopted the RFC formulated by Dr. Entwistle's FCE assessment

10

(found at AR 251-58). In other words, Mr. Audet assumed Ms. Dike could occasionally lift 20 pounds, frequently lift 10 pounds, stand walk or sit six hours out of an eight hour workday with normal breaks, push and pull unlimited, no climbing ladders, ropes or scaffolds, occasional kneeling and crawling, and no manipulative or visual limitations. Given this set of limitations, Mr. Audet found that Ms. Dike would be capable of returning to her past relevant work of a fast food worker or a cashier. AR 633. He saw no reduction in the full range of light duty work which would be available to Ms. Dike.

Mr. Audet commented on Dr. McElroy's stated limitations of lifting five to 10 pounds at a time, and standing, sitting and walking with frequent breaks and intermittent rest with no more than a four hour work day. Audet noted that because Dr. McElroy limited Ms. Dike to a four hour workday, she would not be able to work full time, and that ended the inquiry as far as substantial gainful employment. AR 634.

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) . Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence of substantial evidence supporting his decision." Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted). In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting  it. Woolf, 3 F.3d at 1213.    The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. Id. If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to

11

carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311.

## B.  The Disability Determination and The Five Step Procedure

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511. The ALJ applies a five step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. Bartlett v. Heckler, 777 F.2d 1318, 1319 (8th Cir. 1985). The five steps are as follows:

Step One:   Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

Step Two: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

12

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett v. Heckler, 777 F.2d 1318, 1320 at n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

**C.    Burden of Proof**

The Plaintiff bears the burden of proof at Steps One through Four of the Five Step Inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000); 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at Step Five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting at Step Five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).

**D.    The ALJ's Decision**

The ALJ issued a nine page, single-spaced decision on February 16, 2006. The ALJ's decision discussed steps one through four of the above five-step procedure. Because he determined

13

Ms. Dike was capable of her past relevant work, he did not proceed to step five to determine whether there exists other substantial, gainful activity in the national economy which she is capable of performing.

### E.     The Parties' Positions

Ms. Dike asserts the ALJ erred by finding her not disabled within the meaning of the Social Security Act. She asserts the ALJ erred in two ways: (1) by rejecting the opinion of the examining physician (Dr. McElroy) and (2) by accepting the opinion of the non-examining consultative physician (Dr. Entwistle) to determine her residual functional capacity. The Commissioner asserts his decision is supported by substantial evidence on the record and should be affirmed.

### F.     Analysis

At the outset, it should be noted that "res judicata bars subsequent applications for SSDI and SSI based on the same facts and issues the Commissioner previously found to be insufficient to prove the Claimant disabled." Hillier v. Social Security Administration, 486 F.3d 359, 364 (8th Cir. 2007). If res judicata is applicable, medical evidence from a previous proceeding cannot be reevaluated to prove disability. Id. Res judicata is only preclusive of an award of benefits if the claimant presents no new evidence that "her condition has changed or deteriorated." Id. at 365. It is remembered as this claim is evaluated that the conditions Ms. Dike claims changed or deteriorated since her last unsuccessful disability claim were "both hands have shown more deformity from the rheumatoid, both knees are swollen, mostly right knee and more painful walking, I've been able to spend about four hours working on my (illegible)." She also claimed new physical limitations of "[h]olding items in my hands, typing on computer key board, using items in the kitchen that I use for preparing meals, writing & holding a pen." AR 192.

Ms. Dike asserts the ALJ made two mistakes:  (1) rejecting Dr. McElroy's opinion and (2) accepting Dr. Entwistle's opinion.  These assertions will be examined in turn.

### 1.     Dr. McElroy's Opinion

Dr. McElroy performed a one time consultative exam in May, 2004.  Her assessment was based on her own examination, Ms. Dike's subjective complaints of pain, and the history provided by Ms. Dike.  AR 540-543.  Dr. McElroy ordered x-rays f Ms. Dike's right hand (AR 514) and left knee (AR 515).  The right hand was normal and the left knee showed mild to moderate osteoarthritis.

Id.  Dr. McElroy's physical exam revealed a tender low back, but good range of motion in the shoulders and knees, despite popping and crepitance in the knees. She noted no pain, swelling or deformities in Ms. Dike's hands. Strength was basically normal in the upper and lower extremities. Despite these findings, Dr. McElroy concluded Ms. Dike could lift no more than 5-10 pounds, that she could stand, walk and sit with frequent breaks and intermittent rests, and could only work 4 hours per day. AR 543. She expressly based the lifting restriction on Ms. Dike's "being in constant pain." Id.  She did not expressly explain why frequent breaks, intermittent rest, or the limitation to a four hour workday were required.

### A.   Inconsistencies

The ALJ assigned Dr. McElroy's opinion "no weight" because he noted inconsistencies and reliance on the subjective reports of the claimant, which the ALJ found not entirely credible. "[A treating physician's opinion is normally accorded a higher degree of deference than that of a consulting physician, but such deference is not always justified. When the treating physician's opinion consists of nothing more than conclusory statements, the opinion is not entitled to greater weight than any other physician's opinion." Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991). Also, "a physician's conclusory statement of disability without supporting evidence does not overcome substantial medical evidence supporting the secretary's decision." Loving v.Dept. of Health and Human Services Secretary, 16 F.3d 967, 971 (8th Cir. 1997). Finally, to be entitled to controlling weight, the treating physician's opinion must be well supported by medically acceptable clinical and laboratory diagnostic techniques and not be inconsistent with the other substantial evidence in the record. Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).[4]  When the treating physician's conclusions are based in part on subjective complaints which are properly found to be not credible by the ALJ, the ALJ may reject those conclusions upon which the physician based his findings on the subjective complaints. Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996).  Finally,

---

[4]Although these cases refer to treating and examining/consulting physicians, the same logic would apply to the weight to be given to the opinions of examining/consulting versus non-examining physicians, which is the situation in this case. See also 20 C.F.R. 404.1527(d) which explains the proper weight to be assigned to all medical opinions contained within the administrative records and the factors to consider when evaluating the appropriate weight to assign to medical opinions whether they be treating, examining, or consulting.

Dr. McElroy based at least some of her restrictions on the conclusion that Ms. Dike was "in constant pain." AR 543. The Eighth Circuit has noted however, that a physician's "observations regarding pain levels would not conclusively show that [a claimant] cannot engage in substantial gainful activity. The mere fact that working may cause pain or discomfort does not mandate a finding of disability." Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000).

The ALJ's assignment of no weight to Dr. McElroy's physical restrictions (sedentary duty, four hours per day) based on inconsistency in her report is supported by substantial evidence. The ALJ correctly noted that Dr. McElroy's physical exam was relatively normal (good range of motion and strength in upper and lower extremities, no sign of swelling in the hands, fingers or wrists, but the restrictions she imposed (sedentary part-time work) were inconsistent with her physical findings. This inconsistency was not explained in the record.

To decide whether the ALJ properly rejected the restrictions which were imposed by Dr. McElroy based Ms. Dike's subjective pain complaints (which the ALJ rejected as not credible) it is necessary to examine the ALJ's credibility determination.

## B.   Credibility Determination

This analysis must begin with the principle that the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005). "When an ALJ reviews a claimant's subjective allegations of pain and determines whether the claimant and his testimony are credible, the ALJ must examine the factors listed in Polaski and apply those factors to the individual." Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996). See also Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3). In this case, the ALJ's lengthy analysis applies some of the Polaski factors and explains how they apply to Plaintiff. The ALJ is not required to "explicitly discuss each Polaski factor in a methodical fashion" but rather it is sufficient if he "acknowledge[s] and consider[s] those factors before discounting [the claimant's] subjective complaints of pain." Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996) (emphasis added).

The appropriate factors to be considered when evaluating whether a claimant's subjective complaints are consistent with the evidence as a whole are: (1) the objective medical evidence; (2) the claimant's daily activities; (3) the duration, frequency and intensity of pain; (3) dosage and

16

effectiveness of medication; (4) precipitating and aggravating factors; (5) functional restrictions; (6) the claimant's prior work history; (7) observations by third parties; (8) diagnosis by treating and examining physicians; (9) claimant's complaints to treating physicians. See Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001); Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993).

The ALJ did not explicitly cite Polaski or 20 C.F.R. § 404.1529(c)(3), but he did discuss several of the relevant factors in determining the credibility of Ms. Dike's pain complaints. For example, he discussed her lack of medical treatment between the time her worker's compensation claim settled in 2002 and immediately prior to her administrative hearing when she saw Dr. Smith (December, 2005) (AR 22-23). He found that her failure to seek treatment for her various claimed ailments was inconsistent with her claims of disabling pain. AR 23. He also noted Ms. Dike's use (or lack thereof) of medications for her alleged constant pain. He noted that she takes no prescription pain medication but rather only Ibuprofen and Tylenol. AR 23. He compared her claimed pain with her admitted daily activities, which at the time of hearing included working 5.5 hours per day, 5 days per week. Her supervisor reported she did not required any unscheduled breaks, and Ms. Dike stated the job was within her capabilities. Nevertheless, Ms. Dike asserted she could not perform the job full time or long term. Ms. Dike reported she is able to function normally at home when she finishes work. AR 23. The ALJ also noted the medical opinions in the record, including the RFC opinions from Dr. Entwistle (the non-examining consulting physician) and Dr. Blow (the treating physician who last treated Ms. Dike in August, 2002 and concluded she could perform light duty work). He also considered the conditionally valid FCE which was performed in August 2001 and the opinion of the consulting physician, Dr. Michele McElroy. AR 24-25. The ALJ considered Ms. Dike's work history (AR 25) and the statement from her neighbor Id. In the end, the ALJ found that Dr. Entwistle's FCE was not substantially different from Dr. Blow's 2002 opinion other than Dr. Entwistle's opinion was more recent. AR 25. Entwistle's opinion was also consistent with the recent opinion of Dr. Smith (the only physician with whom Ms. Dike had treated since her last application was denied). The ALJ found that Entwistle's FCE was also consistent with Ms. Dike's activities of daily living and her treatment record. AR 25. The ALJ's credibility findings are supported by good reasons and substantial evidence. They will not, therefore, be disturbed by this Court. Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999). The ALJ therefore properly rejected the restrictions which

were imposed by Dr. McElroy based on Ms. Dike's subjective complaints of pain, because Ms. Dike's subjective pain complaints were not accepted as completely credible by the ALJ.   Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996).

### 2.    Dr. Entwistle's Opinion

Ms. Dike also asserts the ALJ erred by adopting Dr. Entwistle's opinion regarding her physical capabilities, and finding she is capable of light duty work.   While  the opinion of a non-examining consulting physician *standing alone* does not constitute substantial evidence,  when the ALJ relies on the opinion as one part of the record which as a whole supports his findings, it is sufficient. Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004). See also, Anderson v. Barnhart, 344 F.3d 809, 812-13 (8th Cir. 2003) (generally consulting physician opinion does not constitute substantial evidence but there are two exceptions: (1) where the consulting assessment is supported by better or more thorough medical evidence; (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions).   In this instance, both exceptions apply.  Dr. Entwistle explained that his opinion was consistent with Ms. Dike's treating physiatrist (Dr. Blow).  Dr. Entwistle's opinion was also consistent with the most recent medical care Ms. Dike had received from Dr. Smith, who released her to work restricting only her kneeling and squatting activities.  Likewise, the ALJ's rejection of Dr. McElroy's opinion is supported by substantial evidence for the reasons already explained.

Ms. Dike asserts Entwistle's opinion is not supported by substantial evidence because he did not acknowledge the difference between his opinions and Dr. McElroy's opinions or explain why Dr. McElroy's opinions were not supported by the evidence. See Physical Residual Functional Capacity Assessment Form, AR 257.  Dr. Entwistle clearly considered Dr. McElroy's opinions, however, because he cited some of her findings in the narrative portion of the form which asked for parts of the medical record which *supported his* conclusion.  AR 253.  Dr. Entwistle provided adequate support for his opinion in his report, and there is otherwise substantial evidence in the record to support it.  That when he checked a box on a form Dr. Entwistle acknowledged the similarity between his opinion and Dr. Blow's opinion  but not the difference between his opinion and Dr. McElroy's opinion does not render his ultimate conclusion unsupportable.  Nor does it render the ALJ's reliance on his opinion unsupported by substantial evidence.

18

## CONCLUSION

For the reasons explained above, it is respectfully recommended that the Commissioner's denial of benefits be AFFIRMED, and the Plaintiff's Complaint be DISMISSED, with prejudice and on the merits.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990). Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated this _22nd_ day of August, 2007.

BY THE COURT:

_John ̸John ̸Simko ̸_
John E. Simko
United States Magistrate Judge

ATTEST:

JOSEPH HAAS, Clerk

By _Sharon Loufo_ , Deputy

19